## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HERMAN MINKIN and H&M AERONAUT TOOL CO., INC.,** | **Civil Action No. 2:08-02451** |
| **Plaintiffs,** | **OPINION** |
| **v.** | **HON. WILLIAM J. MARTINI** |
| **GIBBONS P.C.** | |
| **Defendant.** | |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on Defendant Gibbons P.C.'s Motion for

Summary Judgment seeking dismissal of Plaintiffs' Complaint pursuant to Federal Rule

of Civil Procedure 56(b). Oral argument was not held. Fed. R. Civ. P. 78. For the

reasons stated below, Defendant's motion is **GRANTED** and Plaintiffs' Complaint is

**DISMISSED WITH PREJUDICE**.


I.      INTRODUCTION

Plaintiff Herman Minkin ("Minkin") worked as an airplane mechanic for most of

his adult life, serving in the United States Navy and as an employee of Pan American

Airways, among other aviation companies. (Affidavit of Stephen R. Long, hereinafter

"Long Aff.," Ex. A, Deposition of Herman Minkin, 245:31-258:11; 277:13-279:1, May 8,

2009, hereinafter the "Minkin Dep.") In the late 1960s, frustrated by the lack of a

suitable tool that would enable him to reach deep inside airplane engines without

1

disassembling external components, Minkin conceived of the idea to create extended reach pliers ("ERPs").  (*Id.* at 286:14-287:7.)  These pliers would have two pivots instead of one and would facilitate accessing bolts or nuts located in deep narrow areas, where conventional pliers could not reach.  (*Id.* at 288:16-289:6.)  The working end jaws of the ERP would also open wider than the internal jaws, creating a higher mechanical advantage than conventional pliers.  (*Id.* at 289:15-18.)  Over the years, Minkin developed a prototype (the "Minkin prototype") and drawing (the "Minkin drawing") of his tool (the "Minkin tool").  (Defendant's Brief, hereinafter "Def. Br.," at 5.)

In 1996, Minkin sought to secure a patent for his invention and retained Defendant law firm Gibbons P.C. ("Gibbons") for this purpose.  (Long Aff. Ex. D; Plaintiffs' Complaint, hereinafter "Cmplt.," ¶¶ 4, 6.)  To aid in the process, Minkin provided Gibbons with access to the Minkin prototype and Minkin drawing.  (Def. Br. at 7.) Minkin also provided the attorneys with the results of a search for prior art in the field conducted for him by an independent search firm he had hired several years earlier. (Minkin Dep. 336:19-340:16.)  The search results revealed prior art consisting of 11 U.S. patents, most of which were for multi-pivoted gripping hand tools dating back to the late 1800s and early 1900s.  (Long Aff. Exs. E-O.)  According to Defendant, these tools contained many similarities to the Minkin tool and demonstrate crowding in the field of prior art.  (Def. Br. at 7.)  Minkin asked Gibbons not to supplement or update the prior art search in preparing the patent application because of the expense involved.  (Minkin Dep. 339:12-24; Long Aff. Ex. D.)

Gibbons prepared a patent application on Minkin's behalf.  (Cmplt. ¶ 9.)  The application included three independent claims and additional dependent claims.  (Long Aff. Ex. T.)  The application and accompanying disclosure statement regarding the prior art known to the inventor was filed with the Patent and Trademark Office ("PTO") on June 7, 1996.  (*Id.*)  The PTO denied the application on October 22, 1996.  (Long Aff. Ex. W.)  The examiner rejected two of the claims on the basis that they were anticipated by a prior art reference the examiner had located, a patent issued in 1903 known as the Brindos patent  ("Brindos"), that had not come to light during the search commissioned by Minkin.  (*Id.*)  The examiner rejected two additional claims on the grounds of obviousness, also related to Brindos.  (*Id.*)  Specifically, the examiner stated that even though the Brindos patent did not disclose the claimed relative lengths of the handle members as Minkin's application did, "it would have been obvious to one of ordinary skill in the art at the time the invention was made to have placed the pivot point [where Minkin did]… since it has been held that where the general conditions of a claim are disclosed in the prior art, discovering the optimum or workable ranges involves only routine skill in the art."  (*Id.*)  The remaining claims were also rejected based upon Brindos and obviousness.  The examiner additionally identified three other examples of prior art that had not been discovered in the search commission by Minkin.  (*Id.*)

Gibbons amended the application and re-filed it with the PTO on December 19, 1996. (Long Aff. Ex. Y.)  The amendment focused on the relationship between the handles of the Minkin tool, arguing that that it gave rise to "an increased mechanical advantage" previously unavailable.  (*Id.*)  Nevertheless, the amended application was also

rejected, this time exclusively on obviousness grounds.  (Long. Aff. Ex. Z.)  On August 1, 1997, Gibbons filed a continuation in part application, which included a set of declarations specifically directed at the examiner's obviousness rejections.  (Long Aff. Ex. EE.)  Gibbons worked closely with Minkin to prepare the declarations, which in particular addressed the structural ratios set out in the claims and described why they made his invention an improvement which had not been fulfilled by the prior art.  (Long Aff. Ex. AA.)  On July 14, 1999, the PTO examiner held an office interview during which she examined the Minkin prototype directly.  (Plaintiffs' Opposition Brief, hereinafter "Pl. Opp.," at 11.)  Following the interview, the examiner entered a memorandum on the docket indicating that she had changed her opinion as to the patentability of the Minkin prototype.  (Long Aff. Ex. FF.)  A patent for the Minkin tool (the "'363 patent") was issued on January 11, 2000.  (Cmplt. ¶ 9.)

After the issuance of the patent, Minkin began to manufacture and market his tool. (Minkin Affidavit, hereinafter "Minkin Aff.," ¶ 8.)  Plaintiff H&M Aeronaut Tool Co., Inc. ("H&M") was formed and a factory in China began production.  (*Id.*)  By 2004, major tool companies including Danaher Tool Company ("Danaher") had become significant customers.  (*Id.*)  However, by 2007, Minkin learned that Danaher had created and was marketing its own version of extended reach pliers that was similar but not identical to Minkin's invention (the "Danaher tool").  (*Id.* at ¶ 9; Cmplt. ¶ 13.)  It is undisputed that Danaher successfully designed around the constraints of the '363 patent and that the Danaher tool does not infringe the '363 patent.  (Minkin Aff. ¶ 9.)

The gravamen of Plaintiffs' Complaint is that Defendant committed malpractice by negligently drafting the claims in the '363 patent so narrowly as to offer virtually no protection against competitors. (Cmplt. ¶ 11.) Plaintiffs make additional allegations suggesting that the legal services rendered by Gibbons were substandard. (Pl. Opp. at 5-7.) Specifically, Plaintiffs allege that the Gibbons partner directly responsible for the legal representation had successfully prosecuted less than 10 patents at the time he represented Minkin. (*Id.*) Plaintiffs also claim that much of the legal work was performed by an associate who had been admitted to practice law for less than 3 ½ years at the time of the representation and that additional work was outsourced to a contract attorney who did not work for the firm directly. (*Id.*) Although these facts appear to be offered to demonstrate that Gibbons deviated from the governing standard of care expected of an attorney, without more they are not legally relevant to this motion.

    Plaintiffs filed a complaint alleging malpractice against Defendant in state court in April 2008. Defendant subsequently removed the case to federal court, because resolution of the state law malpractice claims will involve a substantial and disputed question of federal patent law. Presently before the Court is Defendant's Motion for Summary Judgment, arguing that the Complaint should be dismissed because (1) Plaintiffs' malpractice cause of action must fail given that Minkin cannot establish causation, an essential element of a malpractice claim, and (2) Plaintiffs' sole expert witness is not qualified to opine on patentability such that his testimony is inadmissible pursuant to Federal Rule of Evidence 702. (Def. Br. at 2-3.)

## II.    ANALYSIS

### A.    Subject Matter Jurisdiction

Before the Court can adjudicate the merits of Defendant's motion, it must satisfy itself that it has subject matter jurisdiction over the action. *Andrus v. Charlestone Stone Products Co*., 436 U.S. 604, 608 (2002); *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884).  Indeed, if the Court does not conclude that subject matter jurisdiction exists, it must decline to entertain the suit. *Bender v. Williamsport Area School District,* 475 U.S. 534, 541(1986); *Brown v. Francis*, 75 F.3d 860, 866 (3d Cir.1996).

Federal district courts have exclusive jurisdiction over patent cases. *See* 28 U.S.C. § 1338(a) (the "district court shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents...  Such jurisdiction shall be exclusive of the courts of the states in patent… cases").  § 1338 jurisdiction extends to any case in which "a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Industries Operating Corp*., 486 U.S. 800, 809 (1988).  More specifically, the *Christianson* test requires determination of whether a "state-law claim necessarily raise[s] a stated federal issue… which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308, 314 (2005).  Determination of claim scope has been found to involve a substantial question of federal law that satisfies the federalism concerns of the *Grable*

court.  *See Immunocept LLC v. Fulbright & Jaworski*, 504 F.3d 1281, 1285-86 (2007)

(patent claim scope defines the scope of patent protection such that it is certainly a

substantial question of federal law; it is a complex analysis such that litigants will benefit

from adjudication before federal judges who are more familiar with the process;

adjudicating claim scope in federal court will promote uniformity).  Finally, the law of

the Federal Circuit governs patent law issues and therefore jurisdiction in this case.  *See*

*Davis v. Brouse McDowell*, 596 F.3d 1355, 1359-62 (Fed. Cir. 2010).

Here, Plaintiff's well-pleaded complaint alleges malpractice as its sole cause of

action.  (Cmplt. ¶ 11.)  The sole basis for the malpractice claim is that alleged attorney

error resulted in the drafting of patent claims that were overly narrow in scope.  Plainly,

there is no way Plaintiff can prevail without addressing claim scope.  (*Id.*)  Therefore, the

Court finds that a substantial question of federal law exists and that resolution of this

question by the federal courts will not disrupt the balance of power between state and

federal government.  The Court concludes that subject matter jurisdiction exists and will

thus turn to the merits of the summary judgment decision.


**B.     Standard of Review**

Summary judgment eliminates unfounded claims without resorting to a costly and

lengthy trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  However, a court

should grant summary judgment only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Celotex Corp.*, 477 U.S. at 323. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id.* at 325. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

### C.      Defendant's Arguments in Support of Summary Judgment

Defendant argues that summary judgment and dismissal of the Complaint is appropriate because (1) Plaintiffs have failed to establish causation, an essential element of a malpractice claim, and (2) Plaintiffs' sole expert witness is unqualified such that his testimony is inadmissible. (Def. Br. at 2-3.)

### 1.      Alleged Lack of Causation

Legal malpractice is a variation on the tort of negligence. *McGrogan v. Till*, 167 N.J. 414, 425 (2001). To establish a cause of action for negligent legal malpractice in New Jersey, a plaintiff must demonstrate (1) the existence of an attorney-client relationship imposing a duty of care upon the attorney, (2) breach of that duty, defined as deviation from the standard of care, and (3) proximate causation. *Garcia v. Kozlov, Seaton, Romanini*, 179 N.J. 343, 357 (2004); *Conklin v. Hannock Wiesman*, 145 N.J. 395, 416 (1996). Where the theory of a legal malpractice case puts at issue the merits of the underlying matter, a "case-within-a-case" causation standard typically applies. *Davis*, 596 F.3d at 1360-61. This means that to demonstrate causation, the plaintiff must prove the elements of the underlying case and that he would have recovered a judgment therein. *Garcia*, 179 N.J. at 358. In the patent prosecution context, malpractice claims most frequently arise in situations where the plaintiff alleges that his attorney's negligence resulted in the PTO's rejection of a patent application. *See, e.g., Davis*, 596 F.3d at 1360-61. In those instances, to prove causation using the case-within-a-case standard, the plaintiff must demonstrate that his invention was patentable, *i.e.* but for the attorney's negligence, a patent would have issued. *Id.* Otherwise, regardless of an attorney's deviation from the standard of care, a plaintiff cannot recover. *Id.*

Here, however, Minkin complains not that Gibbons failed to obtain a patent for his invention, but rather that the patent it did obtain was drafted so narrowly that it failed to offer any protection against competitors, namely Danaher. (Cmplt. ¶ 11.) Therefore, to establish causation in this case, Minkin must demonstrate (1) the existence of alternate claims language for the Minkin invention that the PTO would deem patentable, and (2)

that this alternate language would cover the Danaher tool.  Plaintiff concedes the use of the case-within-a case causation standard here, for the purposes of this motion only.  (Pl. Opp. at 16.)

To demonstrate patentability, a plaintiff must prove that, as set out in the Patent Act, his proposed claims define an invention that is useful, novel, non-obvious, and enabled.  *See* 35 U.S.C. § 100 *et seq*.; *Medtronic, Inc. v. Cardiac Pacemakers, Inc*., 721 F.2d 1563, 1567 (Fed. Cir. 1983).  These are precisely the criteria that a patent examiner at the PTO would use to evaluate a patent application.  *See, e.g*., MANUAL OF PATENT EXAMINING PROCEDURE, § 706 (Eighth Edition August 2001) (revised August 2006).  Each of these elements is essential, because in the absence of any one, a PTO examiner is required to reject the claim.  *Id.*

The requirements of novelty, also known as anticipation, and obviousness, are the only two elements at issue in this litigation.  The concept of novelty/ anticipation mandates that a patent cannot issue if all of its elements are contained in a single piece of prior art.  35 U.S.C. 102; *Structural Rubber Products Co. v. Park Rubber Co*., 749 F.2d 707, 715 (1984).  The obviousness requirement, arguably a more subtle inquiry, provides that a patent may not be obtained, even if an invention is not identical to a piece of prior art, "if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex, Inc*., 550 U.S. 398, 406-07 (2007).  Therefore, an obviousness analysis typically requires (1) determination of the scope and content of the prior art; (2)

determination of the level of ordinary skill in the art; (3) ascertaining the differences between the claimed invention and the prior art; and (4) utilizing secondary considerations such as commercial success, long felt but unresolved needs, and failure of others. *KSR*, 550 U.S. at 406-07.

Here, Plaintiffs' sole proposed expert witness, Richard Gearhart, is a patent attorney who has produced a report presenting two sample patent claims that he alleges do not contain the narrow limitations of the '363 patent. (Pl. Opp. at 12; Long Aff. Ex. B.) Presumably he means by this that the sample claims would have protected Plaintiffs against the Danaher tool, although he provides no opinions or rationale in support of this proposition. (*See* Response to Statement of Material Facts ¶ 19.) But even assuming that this is true and Gearhart's sample claims would have covered the Danaher tool, Plaintiffs cannot prevail unless they can also demonstrate the patentability of the sample claims— *i.e.* that had Gearhart submitted them to the PTO, a patent would have issued.

Clearly, a patent cannot issue unless it is deemed non-obvious. *See Graham v. John Deere Company of Kansas City*, 383 U.S. 1, 14 (1965). Yet Gearhart utterly fails to provide any sort of analysis with respect to the alleged non-obviousness of his claims and gives no opinions or explanation showing why his claims would not be deemed obvious. He makes no attempts to set forth the content of the prior art, to describe how the sample claims differ from the prior art, nor even to identify the level of ordinary skill in the field. Indeed, he makes nothing more than a bald assertion that his samples "would have avoided the prior art" without explaining what he means by this, how he arrived at such a conclusion, or how it relates to obviousness. (Long Aff. Ex. B at 30.) As such, this

statement is merely an inadmissible net opinion that fails to shed any light on the question of obviousness.

Indeed, Gearhart admits that it would be "very speculative" to say the PTO would have issued his sample claims.  (Long Aff. Ex. X, Deposition of Richard Gearhart, hereinafter "Gearhart Dep.," 192:21-23, Nov. 19, 2009.)  Moreover, even though his testimony acknowledges that evidence of non-obviousness is crucial to the issuance of a patent, he appears to concede that he failed to perform this analysis, stating that he had no particular opinions on the topic of non-obviousness, it would have taken too long, and would have been too difficult for his colleagues to read.  (*Id.* at 400:1-10, 402:9-10.)  In short, Gearhart has entirely failed to provide any evidence demonstrating that his sample claims are not obvious.   The expert record is now closed and has been for some time pursuant to an order of this court.  (*See* CM/ECF Docket Entry No. 19.)  Therefore, this lack of evidence means Plaintiffs can neither demonstrate the patentability of Gearhart's sample claims nor establish the causation element of the malpractice claim.

Plaintiffs make two arguments in opposition.  First, they posit that proof of non-obviousness is not necessary, because the fact that the PTO ultimately concluded that the '363 patent was non-obvious means it can be assumed or inferred that any alternative language pertaining to the same underlying invention would also be deemed non-obvious. (Pl. Opp. at 18.)  This argument is entirely unavailing.  Not only do Plaintiffs fail to provide any legal support for this contention, but it is contrary to both common sense and well-settled principles of patent examination.  The very problem with which Gibbons was faced when drafting claims for the Minkin invention in a crowded field of prior art was

12

how to design a patent that would be broad enough to offer meaningful protection yet also narrow enough to be deemed non-obvious and therefore patentable.  Moreover, as Defendant argues, the "issuance of the '363 patent did not vest Minkin's tool, as distinct from the disclosures of the '363 patent, with an indelible PTO imprimatur of non-obviousness.  The '363 patent embodies the PTO's findings and conclusions relative to the invention *as claimed in the '363 patent*."  (Defendant's Reply Brief, hereinafter "Def. Rep.," at 6.)  Plainly, if a patent for the Minkin invention had been drafted in a slightly different manner, there is no guarantee whatsoever that the alternative language would have been deemed non-obvious.

This repudiation of Plaintiffs' argument is affirmed by well-established patent principles.  When a patent holder seeks to add broader claims to a pre-existing patent and files what is known as a reissue application, no presumption of non-obviousness attaches. *See* 35 U.S.C. § 251; 37 C.F.R. 1.176(a); *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 882 F.2d 1556, 1563 (Fed. Cir. 1989).  Rather, the PTO examiner reviews the application from scratch, analyzing each patentability requirement, including non-obviousness, as if there were no pre-existing patent.  *Id.*  It is therefore clear that the fact that the '363 patent was ultimately deemed non-obvious does not mean that a PTO examiner would come out the same way if the claims were drafted in a different manner.

Plaintiffs appear to recognize the inherent weakness of their argument and therefore emphasize the fact that the '363 patent did not issue until the examiner conducted an in-office interview and held the Minkin prototype in her hand.  They try to argue that because it was not until the examiner saw the prototype herself that she

concluded it was not obvious, her decision was based entirely upon viewing the invention and not upon the language of the claims.  Therefore, the argument continues, any other claims language based upon the same physical object would have met with the same result.  Nevertheless, as described above, a non-obviousness analysis focuses on the manner in which claims language defines an invention, not that invention in the abstract. Thus, the fact that seeing the invention in person may have helped the examiner in her determination does not alter the fact that any new patent application is evaluated based upon the claims language and that altering the claims language could surely alter the examiner's conclusion.  It is clear that proof of non-obviousness is necessary to Plaintiffs' claim.

Second, Plaintiffs argue in the alternative that even if proof of non-obviousness is necessary, Gearhart has explicitly set out this proof in detail in his 37 page supplemental expert report.  (Pl. Opp. at 19.)  It is true that Gearhart has prepared and filed a 37 page supplemental expert report which does provide certain opinions on the patentability of his alternative claims.  (Long Aff. Ex. SS.)  It is even arguable that it does so in detail. However, a review of this supplemental expert report makes it clear beyond all doubt that the opinions contained therein are strictly limited to novelty/ anticipation concerns.  (*Id.*) Indeed, the report goes through 16 pieces of prior art and explains why, in Gearhart's opinion, each claim in the prior art does not anticipate the various claims contained in his sample patents.  (*Id.*)  But the opinions do not touch on obviousness whatsoever.  While analyses of novelty and obviousness overlap to a degree, the Federal Circuit has ruled conclusively that they are separate and distinct inquiries.  *See Cohesive Technologies,*

14

*Inc. v. Waters Corp.*, 543 F.3d 1351, 1363-64 (Fed. Cir. 2008).  Therefore, an analysis of

one cannot substitute for an analysis of the other.  *Id.*  Despite Plaintiffs' assertions to the

contrary, Gearhart's 37 page supplemental expert report provides no proof of non-

obviousness.

       After reviewing all of the arguments, it is clear that Gearhart has failed to provide

any sort of evidence demonstrating that his sample alternative claims are non-obvious.

As such, he has failed to provide the necessary proof that a patentable alternative to the

'363 patent exists.  The expert opinion record has been closed for some time, despite

numerous extensions and opportunities to supplement it having been granted to Plaintiffs.

(*See* CM/ECF Docket Entry No. 19.)  Therefore, Plaintiffs are unable to demonstrate

causation.  As a matter of law, they cannot satisfy the elements of a malpractice cause of

action, and summary judgment in favor of Defendant is warranted.

### 2.      Witness's Alleged Lack of Qualifications

       Defendant also argues that Gearhart, Plaintiffs' sole expert witness, lacks the

requisite qualifications to testify on matters relating to the mechanical arts, such that any

testimony he might provide is inadmissible pursuant to Federal Rule of Evidence 702.

(Def. Br. at 32.)  However, given that Defendant has conclusively demonstrated that

Plaintiffs have failed to demonstrate causation regardless of Gearhart's expert opinions,

the Court finds it unnecessary to resolve this issue.

### III.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is

**GRANTED**.  Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.  An

appropriate order follows.


/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**